=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 198
The People &c.,
            Respondent,
        v.
Costandino Argyris,
            Appellant.
----------------------
No. 199
The People &c.,
            Respondent,
        v.
John A. DiSalvo,
            Appellant.
----------------------
No. 210
The People &c.,
            Respondent,
        v.
Eric R. Johnson,
            Appellant.


Case Nos. 198 and 199:
        Steven R. Kartagener, for appellants.
        Donna Aldea, for respondent.

Case No. 210:
        Edward L. Fiandach, for appellant.
        Jeffrey L. Taylor, for respondent.


MEMORANDUM:

        In People v Argyris and People v DiSalvo, the orders of

the Appellate Division should be affirmed.  In People v Johnson,

the order of County Court should be reversed, the suppression

- 1 -

motion granted and the accusatory instrument dismissed.

Regardless of whether we apply a totality of the circumstances test or the Aquilar-Spinelli standard (see Spinelli v United States, 393 US 410 [1969]; Aquilar v Texas, 378 US 108 [1964]), there is record support for the lower courts' findings that the stops were lawful in People v Argyris and People v DiSalvo.  The police had reasonable suspicion to stop defendants' vehicle based on the contents of a 911 call from an anonymous individual and the confirmatory observations of the police. Specifically, because sufficient information in the record supports the lower courts' determination that the tip was reliable under the totality of the circumstances, satisfied the two-pronged Aquilar-Spinelli test for the reliability of hearsay tips in this particular context and contained sufficient information about defendants' unlawful possession of a weapon to create reasonable suspicion, the lawfulness of the stop of defendants' vehicle is beyond further review.  Furthermore, under these circumstances, the absence of predictive information in the tip was not fatal to its reliability (compare People v Moore, 6 NY3d 496, 499 [2006] with Navarette v California, __US__, 134 S Ct 1683, 1688-1692 [2014]).  On this record, the lower courts did not err in concluding that the police's other actions were lawful (see People v Brnja, 50 NY2d 366, 372 [1980]).

In People v Johnson, whether evaluated in light of the totality of the circumstances or under the Aquilar-Spinelli

framework, the reliability of the tip was not established.  The caller's cursory allegation that the driver of the car was either sick or intoxicated, without more, did not supply the sheriff's deputy who stopped the car with reasonable suspicion that defendant was driving while intoxicated (see generally People v DeBour [La Pene], 40 NY2d 210, 225 [1976]; cf. Navarette, 134 S Ct at 1690-1692).  Although the deputy observed defendant commit a minor traffic infraction, this did not authorize the vehicle stop because he was outside his geographical jurisdiction at the time of the infraction (see CPL 140.10 [2] [a]), and defendant's actions in committing the violation did not elevate the deputy's suspicion sufficiently to justify the stop of defendant's car. The issue of whether suppression should be denied on the theory that the deputy's violation of the statutory limits on his jurisdiction does not warrant suppression is not before us.

People v Constandino Argyris
People v John A. DiSalvo
People v Eric Johnson

Nos. 198, 199, 210

SMITH, J. (concurring):

Four Judges agree that we should affirm in the first
two of these cases and reverse in the third, but we disagree on
the rationale.  The issue that divides us is whether to apply the
Aquilar-Spinelli test to stops that require only reasonable

- 1 -

suspicion.  We have never done so before, and I think we should not do so now, because the Aquilar-Spinelli test needlessly complicates and confuses the analysis of reasonable suspicion issues.

Under the rule established by Aquilar v Texas (378 US 108 [1964]) and Spinelli v United States (393 US 410 [1969]), whether information supplied by an informant to the police is sufficient to provide probable cause for a search or a seizure is decided by the application of a two-pronged test: Courts must evaluate both the basis of the informant's knowledge and the reliability or veracity of the informant himself (see People v Johnson, 66 NY2d 398, 402-403 [1985]).  The United States Supreme Court, finding the test too rigid, abandoned it in Illinois v Gates (462 US 213 [1983]) in favor of "totality-of-the-circumstances analysis" (id. at 233) -- a polysyllabic way of saying that courts look at all the facts and see if they add up to probable cause.  But our Court has rejected the Gates approach and continues to apply the Aquilar-Spinelli rule to probable cause issues (Johnson, 66 NY2d at 406-407; People v Griminger, 71 NY2d 635, 639 [1988]).

In applying the Aquilar-Spinelli rule, we have moderated the rigidity of the two-pronged test by holding that evidence corroborating the informant's statements may, in some cases, satisfy either the basis-of-knowledge or the veracity/reliability prong (People v Elwell, 50 NY2d 231, 234-235

[1980] [basis-of-knowledge prong may be satisfied only by "confirmation of sufficient details suggestive of or directly related to the criminal activity informed about"]); People v DiFalco, 80 NY2d 693, 695 [1993] ["the veracity component . . . may . . . be satisfied by police corroboration of details that are not, if taken separately, suggestive of criminal activity"]). To the extent that such evidence -- which does not directly prove either the basis of the informant's knowledge or his truthfulness -- may satisfy either prong, the two prongs tend to merge, and the Aguilar-Spinelli rule begins to resemble the totality-of-the-circumstances test.

While we have attenuated the Aguilar-Spinelli rule in the probable cause context, we have not, so far as I know, even applied it before today where the issue was reasonable suspicion. We have decided several reasonable suspicion cases without any reference to the Aguilar-Spinelli rule (People v Moore, 6 NY3d 496 [2006]; People v Salaman, 71 NY2d 869 [1988]; People v Benjamin, 51 NY2d 267 [1980]; People v Stewart, 41 NY2d 65 [1976]). In People v Landy (59 NY2d 369, 375-377 [1983]), we relied on the Aguilar-Spinelli rule in concluding that probable cause was lacking, but then left that rule unmentioned in upholding the search and arrest on the ground that a finding of reasonable suspicion was supported by the record (see also People v Chase, 85 NY2d 493, 501 [1995] [holding probable cause to be lacking on Aguilar-Spinelli grounds; remitting the case, without

further mention of Aquilar-Spinelli, for determination of the reasonable suspicion issue]).

Today, two of my colleagues would "extend the Aquilar-Spinelli standard to the determination of the legality of investigatory stops precipitated by anonymous hearsay tips" (op of Abdus-Salaam, J. at 2). This would mean, presumably, that in such cases a court must find that a reasonable person could suspect -- though not necessarily believe it probable -- that the informant had an adequate basis of knowledge and was a credible or reliable source. The second determination, the so-called "veracity" prong, seems especially hard to make in anonymous tip cases: there are obvious problems in evaluating the veracity of an informant when the police do not know who the informant is.

Judge Abdus-Salaam's opinion overcomes this and any other problems that the Aquilar-Spinelli test may present with a minute analysis of the evidence in these cases. In Argyris and DiSalvo, Judge Abdus-Salaam would find both prongs of the test to be satisfied, relying, as to both prongs, on the content of the recorded 911 call. In Johnson, she would find that the anonymous call did not satisfy the basis-of-knowledge prong, and that no corroborating evidence supplies the deficiency; she does not discuss the veracity prong in deciding Johnson, but she could easily reach a similar conclusion on that issue for essentially the same reasons. I generally agree with the analysis of the facts in Judge Abdus-Salaam's opinion, but I do not see what is

gained by dividing that analysis into two prongs.  Using a totality-of-the-circumstances approach would lead us, more quickly and with less complexity, to the same place.

People of the State of New York v Costandino Argyris
No. 198

People of the State of New York v John DiSalvo
No. 199

People of the State of New York v Eric R. Johnson
No. 210

ABDUS-SALAAM, J. (concurring):

In considering the legality of police searches and seizures instigated by hearsay information under article I, section 12 of the Constitution of the State of New York, we have adhered to the Supreme Court's mid-20th-century jurisprudence on hearsay tips as laid out in <u>Aquilar v Texas</u> (378 US 108 [1964])

- 1 -

and <u>Spinelli v United States</u> (393 US 410 [1969]).  Thus, we have held that hearsay information cannot provide a police officer with probable cause to arrest an individual unless the hearsay report reveals a reliable basis for the informant's knowledge and shows that the informant is generally credible (<u>see</u> <u>People v Johnson</u>, 66 NY2d 398, 406-407 [1985]).  In holding that, under any relevant legal standard, the tip in <u>People v Argyris</u> and <u>People v DiSalvo</u> bears legally sufficient indicia of reliability and the tip in <u>People v Johnson</u> does not (<u>see</u> memorandum opinion at 2-3), the Court does not retreat from this state constitutional tradition, and therefore I join the Court's memorandum opinion in full.

I write separately to suggest further guidance on the legal standards that, in my opinion, should apply to the determination of the legality of investigatory stops precipitated by anonymous hearsay tips.  In my view, courts should apply the <u>Aguilar-Spinelli</u> standard to determine the legality of investigatory stops precipitated by anonymous hearsay tips. Accordingly, I would hold that the police cannot physically seize an individual based solely on an anonymous hearsay tip, regardless of whether they seek to effect an arrest or a brief investigatory stop, unless the tip satisfies the veracity and basis-of-knowledge prongs of the <u>Aguilar-Spinelli</u> test. Furthermore, I would conclude that the determination of whether a tip provides the police with probable cause or reasonable

suspicion depends on the quality of the tip's description of the crime itself, as opposed to its statements regarding the suspect's physical appearance and non-criminal conduct.

I

People v Argyris and People v DiSalvo

At about 2:15 p.m. on July 19, 2007, an unidentified man called 911. The man told the 911 operator that he was near a building at New Town Avenue and 31st Street in Astoria, Queens, and that, as he had come out of the building, he had seen someone with a gun. Specifically, the man said, "I saw a black Mustang, brand new black Mustang with like four guys and I saw one of them put in a big gun in the back of the car." The caller reported the license plate number of the black Mustang. The caller told the operator that the car had "just [gone]" down the block to 28th Street and then turned right onto that street heading toward Astoria Boulevard. According to the caller, a grey van had been accompanying the car. When the operator interrupted the caller and asked whether he wanted to provide his name and telephone number, the caller replied, "No, I don't really want to, I just saw something and I say something, like they say."

When questioned about the men's appearance, the caller said that they were "tall big bully white guys." The operator inquired about the men's clothing, and the caller said that he did not know what they were wearing. He did state, "I'm sorry . . . well, when the guy was putting the gun on the back of the car

that I saw him [sic] . . . so I just made, I play stupid and I went right into my car." The operator asked whether the caller would wait for the police to arrive, and he responded, "Well, uh, do you want me to wait around for them?" The operator stated, "It's up to you." The caller said, "I don't really have to," adding, "OK?" The operator replied, "Alright," and the call ended. The entire 911 call was recorded.

A few minutes later, several New York City police officers on vehicular patrol in separate cars, including Sergeant Louis Bauso, Officer Michael Castelli and Officer Kashim Valles, received a radio run reporting the details contained in the 911 call. Bauso drove to the area described in the call and looked for the black Mustang, but he did not find it. At around 2:30 p.m., Castelli spotted a black Mustang and a grey van on 31st Street. The Mustang had the license plate number reported by the 911 caller. Castelli and his partner decided to follow the vehicles, and Castelli's partner sent a radio transmission stating that they were doing so. The record on appeal does not reveal whether any of the other officers received Castelli's partner's radio run.

Around that time, Sergeant Bauso saw the Mustang and the van at a traffic light, and he pulled over at a bus stop and got out of his car to get a better look at the license plate number on the Mustang. After seeing that the license plate number matched the 911 caller's description of it, Bauso

allegedly pointed at the Mustang and called out, "Pull over." The Mustang continued driving, and at a nearby intersection at 31st Street, the Mustang and the van went in separate directions. Bauso got back in his car and pursued the Mustang.

Meanwhile, Officer Valles saw the Mustang drive toward him and then turn onto 31st Street. Valles drove after the Mustang, and soon thereafter, he stopped it by using his car to cut it off. Valles called for backup, and he got out of his car and pointed his gun at the Mustang. Sergeant Bauso, his partner and about six other officers arrived, and as the backup officers trained their guns on the Mustang, Valles holstered his weapon and directed the occupants of the Mustang to exit the car.

Defendant John DiSalvo exited from the front passenger seat of the Mustang, and Officer Valles observed that DiSalvo had a gun in his waistband. Valles ordered DiSalvo to put his hands on the Mustang, and after DiSalvo complied, Valles handcuffed DiSalvo and searched him, recovering the gun and some cash. Valles then continued to order the occupants of the Mustang to exit one by one, and he handcuffed and searched each one. After the driver was searched, defendant Costandino Argyris emerged from the backseat wearing a bulletproof vest, which was visible underneath his sweatshirt. When Valles searched Argyris, he recovered a metal and leather club, as well as a switchblade, from Argyris's person. Upon searching the car, Valles found a loaded .380 caliber handgun under the driver's seat and a box of

.9 millimeter ammunition on the back seat.[1]

Following their indictment on various weapons-related charges, defendants moved to suppress the items recovered from their persons and the Mustang as the fruits of an unlawful seizure.  At a hearing held on defendants' suppression motion, the officers testified to the facts set forth above, and the People presented the audio recording of the 911 call.  Following the presentation of the evidence, Supreme Court initially issued a written decision granting defendants' suppression motion, reasoning that, under the U.S. Supreme Court's decision in Florida v J.L. (529 US 266 [2000]), the 911 caller's failure to predict defendants' future actions rendered his assertions too unreliable to support the stop of the car.

Subsequently, the People moved for reargument and reconsideration of the suppression decision.  The court issued a written decision granting the People's motion and, upon reconsideration, vacating its prior suppression decision and denying defendants' motion to suppress the physical evidence.  Discussing the relevant legal framework, the court noted that an anonymous informant's hearsay report of criminal activity may give rise to probable cause justifying an arrest if the report

---

[1] Elsewhere on 31st Street, Officer Castelli stopped the grey van.  With the aid of backup officers, Castelli detained and searched the occupants of the van, as well as the van itself, recovering a variety of evidence and contraband in the process. The legality of that police action is not presently before us.

satisfies the two prongs of the Aquilar-Spinelli test.  The court
further observed that, because a tip that satisfies the Aquilar-
Spinelli standard may support an arrest, such a tip may also be
reliable enough to create reasonable suspicion justifying the
lesser intrusion of an investigatory stop.

Under those legal standards, the court found that the
911 caller's statements here were reliable enough to authorize
Officer Valles to stop defendants' car.  The court determined
that, because the 911 caller had provided an accurate description
of the Mustang, the van and their location, his report
established his credibility and thereby met the veracity prong of
the Aquilar-Spinelli test.  And, the court concluded, the
caller's statements demonstrated the basis of the caller's
knowledge, in satisfaction of the basis-of-knowledge prong of the
Aquilar-Spinelli test, because the caller declared that he had
personally seen the occupants of the Mustang place a large gun
therein.  The court also distinguished Florida v J.L., supra,
from this case.  Additionally, the court rejected defendants'
claim that the officers had acted unreasonably in surrounding the
Mustang and ordering defendants out of the car at gunpoint.  In
the court's view, the officers had taken those lawful precautions
out of a reasonable concern for their safety.  Thus, the court
denied defendants' suppression motion in its entirety.

Thereafter, defendant Argyris pleaded guilty to two
counts of criminal possession of a weapon in the second degree

(see Penal Law § 265.03 [1] [b]), one count of criminal possession of a weapon in the fourth degree (see Penal Law § 265.01) and one count of unlawful possession of pistol ammunition (see Administrative Code of the City of NY § 10-131-I [3]), and he was sentenced to an aggregate determinate prison term of three and one-half years.  Defendant DiSalvo pleaded guilty to four counts of criminal possession of a weapon in the second degree (see Penal Law §§ 265.03 [1] [b]; 265.03 [3]), three counts of criminal possession of a weapon in the third degree (see Penal Law § 265.02 [1]) and one count of unlawful possession of pistol ammunition (see Administrative Code of the City of NY § 10-131-I [3]), and he was sentenced, as a second felony offender, to an aggregate determinate prison term of six years, to be followed by five years of post-release supervision.  Defendants appealed from the respective judgments against them, challenging Supreme Court's suppression ruling.

The Appellate Division, Second Department, issued separate decisions and orders affirming the judgments in each case (see People v DiSalvo, 99 AD3d 811 [2d Dept 2012]; People v Argyris, 99 AD3d 808, 808-811 [2d Dept 2012]).  In People v Argyris, the Appellate Division first concluded that "[t]he Aguilar-Spinelli test . . . need not be satisfied where [as here] the necessary predicate for justifying the police action under review is the less demanding standard of reasonable suspicion" (Argyris, 99 AD3d at 810 [internal quotation marks and citations

omitted]).  The court determined that Officer Valles had the requisite reasonable suspicion to stop the Mustang because "the report of the 911 caller, which was based on the contemporaneous observation of conduct that was not concealed, was sufficiently corroborated to provide reasonable suspicion for the stop" (see id. [internal quotation marks and citations omitted]).  Furthermore, the court decided that the police had otherwise acted lawfully when they ordered defendants out of the car at gunpoint, and because the officers properly obtained the relevant evidence from defendants and their car, Supreme Court had correctly denied their suppression motion and accepted their guilty pleas (see id. at 810-811).

In a separate decision and order citing its decision in People v Argyris, the Appellate Division affirmed the judgment in People v DiSalvo and remitted that case to Supreme Court for proceedings regarding defendant DiSalvo's bail under CPL 460.50 (5) (see DiSalvo, 99 AD3d at 811-812).  A Judge of this Court granted defendants leave to appeal from the Appellate Division's orders.

People v Johnson

At about 9:22 p.m. on October 1, 2011, a police dispatcher radioed Yates County Sheriff's Deputy Arlyn Cunningham, Jr., and told him that "a civilian had called 911 and stated that she believed that the driver" of a blue BMW with a particular license plate number was "sick or intoxicated" at the

intersection of Route 245 and Sunnyside Road in the Town of
Italy, which is near the border between Yates County and Ontario
County.  As far as the record shows, the 911 call was not
recorded in any way.

Deputy Cunningham, in his marked patrol car, started
driving south on Route 245 in search of the BMW.  Cunningham
drove to the intersection referenced in the 911 call, but he did
not see the BMW.  After "decid[ing] which was the most probable
route of travel" for the BMW, Cunningham continued driving south
on Route 245 and crossed into Ontario County.

Deputy Cunningham entered the Town of Naples, and he
stopped at a stop sign at the intersection of Route 245 and Route
21.  At the stop sign, he saw the blue BMW with the license plate
number described in the 911 caller's report.  The BMW turned left
onto Route 21.  As Cunningham followed the BMW, that vehicle went
a short distance and then made a "hasty" right turn onto Tobey
Street.  In particular, the BMW activated its turn signal at the
last moment, made a wide right turn, went briefly into the lane
of Tobey Street used by oncoming traffic and then quickly entered
the correct lane.  Cunningham turned onto Tobey Street and
activated his emergency lights and siren.  As Cunningham would
later testify at the suppression hearing in this case, he pulled
over the BMW based on his suspicion that the driver was driving
while intoxicated and also upon his observation of the driver
committing a traffic violation.  However, Cunningham knew that he

could not arrest the driver for the traffic violation because relevant statutes prevented him from arresting someone for a traffic violation outside of Yates County (see CPL 140.10 [2] [a]; cf. CPL 140.10 [1] [b]).

Deputy Cunningham approached the BMW, and he saw defendant, Dr. Eric Johnson, in the driver's seat, accompanied by a female in the passenger's seat. Cunningham noticed that defendant had glassy eyes, a fixed gaze and breath that smelled strongly of alcohol. Cunningham asked defendant to divulge his personal identifying information and his activities that evening. In response, defendant fumbled through his wallet for his driver's license and slurred his words, further convincing Cunningham that he was intoxicated. Cunningham radioed the dispatcher, reported that he had stopped defendant's car and requested that an Ontario County Deputy come to the scene to assist him.

About half an hour later, Ontario County Sheriff's Deputy David Drake responded to the scene, where he also saw defendant exhibiting telltale signs of intoxication. Drake had defendant perform three field sobriety tests, all of which defendant failed. Concluding that defendant had been driving while intoxicated, Drake arrested defendant on that charge and transported him to the station house. There, defendant agreed to take a breath test to measure his blood alcohol content, and the test results revealed that defendant had a blood alcohol content

of 0.15 percent by volume -- nearly twice the legal threshold for driving while intoxicated under Vehicle and Traffic Law ("VTL") § 1192 (2).

After being charged with several counts of driving while intoxicated, defendant moved to suppress his statements to the police and the results of the breath test on the ground that such evidence was the fruit of an unlawful vehicle stop unsupported by reasonable suspicion or probable cause.  At a suppression hearing in Town Court, Deputies Cunningham and Drake testified to the facts described above.

Following the hearing, Town Court issued a written decision denying defendant's suppression motion in its entirety. The court concluded that Cunningham had properly stopped and, with the aid of Deputy Drake, lawfully arrested defendant. According to the court, the 911 caller's tip about a possible incident of driving while intoxicated had authorized Cunningham to follow and "close in" on defendant's car.  Once Cunningham saw defendant make a wide right turn, the court opined, Cunningham had "justification for the stop and investigation of a possible crime of DWI."  And, given that Cunningham saw defendant exhibit signs of intoxication upon stopping the car, Cunningham and Drake had the right to arrest defendant for driving while intoxicated. Consequently, the court ruled, defendant's statements and the breath test results had been lawfully obtained pursuant to a valid stop and arrest.

Defendant moved for reargument, which the court denied. Subsequently, defendant pleaded guilty to a misdemeanor count of driving while intoxicated (see VTL § 1192 [3]), and he was sentenced to a six-month suspension of his driver's license, a conditional discharge and various fines.  Defendant appealed.

County Court affirmed the judgment.  County Court decided that Deputy Cunningham had no authority to stop defendant for the traffic violation of making a wide right turn, saying, "Inasmuch as the deputy who [had] stopped the vehicle, Deputy Cunningham, did not view the defendant drive his vehicle in Yates County, Deputy Cunningham was without authority to stop the defendant for a traffic infraction."  Nonetheless, County Court determined that the 911 caller's tip had given Cunningham reasonable suspicion that defendant had been driving while intoxicated, thereby authorizing Cunningham to stop defendant's car for that crime even in another county.  Specifically, the court decided that, because the tip had accurately identified defendant's car and approximate location, it was reliable enough to establish reasonable suspicion, especially when coupled with Cunningham's personal observation of defendant committing a traffic violation.  Thus, the court concluded that defendant's suppression motion had been properly denied and affirmed the judgment.  A Judge of this Court granted defendant leave to appeal.

II

A

To be reliable enough to establish probable cause for an arrest as a matter of state constitutional law, an anonymous hearsay informant's report of criminal activity must: (1) provide sufficiently detailed information to indicate the informant's reliability as an informant, or in other words, his or her veracity; and (2) convey information showing a reliable basis for the informant's knowledge of the reported illegal activity (see People v Edwards, 95 NY2d 486, 495 [2000]; Johnson, 66 NY3d at 406-407; People v Elwell, 50 NY2d 231, 236-237 [1980]; People v West, 44 NY2d 656, 657 [1978]; see also Spinelli, 393 US 412-413; Aguilar, 378 US at 114-115).  In adopting this rule under the state constitution, we have refused to follow the U.S. Supreme Court's decision in Illinois v Gates (462 US 213 [1983]), which holds that the two prongs of the Aguilar-Spinelli test are merely "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations" under the Fourth Amendment (Gates, 462 US at 233; contrast Johnson, 66 NY3d at 406-407).

Just as reliable hearsay can supply the police with probable cause, such hearsay can give rise to reasonable suspicion, which is the lesser level of suspicion required to authorize an investigatory stop of a person or a moving car under the four-tiered framework of People v DeBour -- also sometimes called a level-three stop under DeBour or, in federal

constitutional parlance, a Terry stop (see Navarette v California, __US__, 134 S Ct 1683, 1687-1688 [2014]; Adams v Williams, 407 US 143, 147 [1972]; Terry v Ohio, 392 US 1, 20-27 [1968]; People v Landy, 59 NY2d 369, 376 [1983]).  In the past, we interpreted the state constitution to permit a level-three stop based on a hearsay report that did not meet both prongs of the Aquilar-Spinelli standard for reliability (see People v Salaman, 71 NY2d 869, 870 [1988]; Landy, 59 NY2d at 376).  Even then, we did not retreat from our general admonition against police reliance on unreliable anonymous tips, noting that hearsay information of that kind was "the weakest sort" of support for a forcible detention (DeBour, 40 NY2d at 224).  Subsequent developments in federal constitutional jurisprudence cast significant doubt on our prior holdings that "unsubstantiated hearsay" reports of criminality are reliable enough to authorize the police to conduct a level-three stop supported by reasonable suspicion (Landy, 59 NY2d at 376).

The relevant changes in federal law originated in Alabama v White (496 US 325 [1990]), in which the U.S. Supreme Court explained that the police cannot detain someone based on completely uncorroborated hearsay and may only act on tips bearing significant indicia of reliability.  In that case, an anonymous hearsay tip apprised the police of the movements of a suspect in detail and alleged that the suspect would have drugs in an attaché case (see White, 496 US at 327).  Although the

police did not see the case upon spotting the suspect, they followed her and stopped her before she reached the destination reported in the tip (see id.). The police then recovered a case of drugs from the suspect's car (see id.). The Supreme Court upheld the legality of the stop, finding that this was a "close case" but that the tip bore sufficient "indicia of reliability" to give the police reasonable suspicion to stop the suspect's car (id. at 327-332). The Court found it particularly significant that the tip predicted the suspect's movements, as such predictive information could only have come from a person with reliable insider knowledge of the suspect's affairs (see id. at 331-332). Accordingly, under White, an anonymous tip cannot support the stop of a car unless it bears sufficient indicia of reliability under the totality of the circumstances, and one important indicium of reliability is a tip's prediction of the future behavior of the suspect.

Subsequently, in Florida v J.L., the Supreme Court invalidated a stop predicated upon a bare-bones tip while suggesting that not all tips need the sort of predictive information discussed in White to be reliable. In J.L., an anonymous caller, whose call was not recorded, told the police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" (J.L., 529 US at 268). Based on the tip, the police stopped 15-year-old J.L. merely because he matched the description, and they recovered a gun from

him (see id.).  They also frisked two other men who were standing near him, despite the fact that the tip had not mentioned those individuals (see id.).  The Supreme Court held that the stop was illegal because "[t]he tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case," and hence the tip did not provide the police with reasonable suspicion (id. at 271).  At the same time, the Court observed that the absence of predictive information was not the only source of the deficiency in the tip, as the tip was also unreliable because the "unknown, unaccountable informant . . . neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." (id. [emphasis added]).  In a concurrence, Justice Kennedy and Chief Justice Rehnquist reenforced this point, suggesting that indicia of reliability such as recording of an anonymous 911 call might allow the police to stop a suspect, regardless of the presence or absence of predictive information (see id. at 274-276 [Kennedy, J., concurring]).

Given White's and J.L.'s reliability requirements for anonymous tips underlying Terry stops, we have subsequently abandoned certain aspects of our prior precedent permitting a stop based on "unsubstantiated hearsay" (Landy, 59 NY2d at 376), acting on constraint of federal constitutional law.  For example, in consolidated appeals in People v William II and People v

Rodriquez, we followed J.L.'s stricter approach to the reliability analysis under the federal constitution, invalidating the stops in both cases based on tips that, in our view, were not sufficiently reliable under J.L.'s mandate (see People v William II, 98 NY2d 93, 98-100 [2002]).  Specifically, we decided that, since the tips lacked both predictive information and any indication that the informants had firsthand knowledge of the relevant crimes, the tips were unreliable "[u]nder the requirements of Florida v J.L." (id. at 99).  Thus, in William II, we necessarily rejected certain facets of our prior decisions that established a low threshold for reliability in the reasonable suspicion context.  In particular, that case stands for the proposition that, under the Fourth Amendment, an anonymous tip is unreliable if it is not made via 911, does not include a statement of the informant's firsthand knowledge of the contents of the report and does not provide any predictive information.  In reaching that conclusion, we did not conduct any independent state constitutional analysis of the reliability of the tips at issue in William II, instead relying exclusively on U.S. Supreme Court precedent.

More recently, in People v Moore (6 NY3d 496 [2006]), we again evaluated the reliability of an anonymous tip under the federal constitution and concluded, in part based on the lack of predictive information in the tip before us, that the tip was not sufficiently trustworthy to give rise to reasonable suspicion

(see Moore, 6 NY3d at 497-501).  In doing so, we relied on
William II's interpretation of J.L., holding that the tip at
issue, which did not feature any predictive information, lacked
any suggestion of the informant's firsthand knowledge of the
crime and was contradicted by the officers' observations at the
scene, was not sufficiently reliable to authorize the police to
conduct an investigatory stop of the suspect (see id. at 498-
501).

In Moore, we also said that "[a]n anonymous tip cannot
provide reasonable suspicion to justify a seizure, except where
that tip contains predictive information -- such as information
suggestive of criminal behavior -- so that the police can test
the reliability of the tip" (id. at 499 [emphasis added]).
However, that pronouncement was not essential to our holding.  In
deciding that the tip implicating the suspect was unreliable,
rather than relying on the absence of predictive information, we
cited numerous other aspects of the tip that called its
credibility into doubt.  Thus, our comment about the possible
necessity of predictive information was dicta based on our
understanding of federal constitutional law at the time, and we
did not establish a predictive information requirement
independently rooted in the state constitution.

After our decision in Moore, the U.S. Supreme Court
explained in Navarette v California that predictive information
is not the sine qua non for the reliability of an anonymous

hearsay tip under the federal constitution.  In <u>Navarette</u>, a police dispatch team from one county in California relayed the contents of a 911 call to a dispatch team in another county (<u>see</u> <u>Navarette</u>, 134 S Ct at 1686).  The reporting dispatchers described the call to the other team as follows: "[s]howing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925.  Ran the reporting party off the roadway and was last seen approximately five [minutes] ago." (<u>id.</u> at 1686-1687).  The receiving dispatch team, in turn, transmitted the information to highway patrol officers (<u>see</u> <u>id.</u> at 1687). Roughly 10 minutes later, a highway patrol officer saw the above-described truck near mile marker 69 -- not far from marker 88 referenced in the 911 report (<u>see</u> <u>id.</u>).  About five minutes later, the officer pulled over the truck, and another officer joined him at the scene (<u>see</u> <u>id.</u>).  When the officers approached the truck, they smelled marijuana and, upon searching the vehicle, recovered 30 pounds of that substance (<u>see</u> <u>id.</u>).  The officers arrested Lorenzo and Jose Navarette, who were the driver and passenger in the truck (<u>see</u> <u>id.</u>).

By a vote of five to four, the Supreme Court affirmed the California courts' decisions denying suppression of the drugs (<u>see</u> <u>id.</u> at 1686-1692).  The Court concluded that the 911 call, as conveyed via the dispatchers, had provided the patrol officers with reasonable suspicion supporting their stop of the Navarettes' truck because, "[e]ven assuming for present purposes

that the 911 call was anonymous, . . . the call bore adequate indicia of reliability for the officer to credit the caller's account" of events (id. at 1688).  In the Court's view, "[b]y reporting that she had been run off the road by a specific vehicle -- a silver Ford F-150 pickup, license plate 8D94925 -- the caller necessarily [had] claimed eyewitness knowledge of the alleged dangerous driving," which "len[t] significant support to the tip's reliability" (id. at 1689).  The Court distinguished J.L. from the case before the Court on the basis that, unlike the tipster in J.L. who "provided no basis for concluding that [he] had actually seen the gun," the 911 caller in this case evidently had personally witnessed the truck driver's unlawful drunk driving (id. at 1689).

The Court further determined that the tip contained information showing that the caller was telling the truth, including the contemporaneous nature of the tipster's report and the officers' success in corroborating the report's description of the truck's appearance and location within a short time of receiving the dispatch about it (see id.).  The Court also stated that, since "a false tipster would think twice before using" an emergency 911 system that allows the authorities to obtain the tipster's telephone number and to record the call for future voice identification, the instant tipster's decision to make her report via the 911 system further reflected her veracity (id. at 1689-1690).  In addition to finding the tip reliable, the Court

concluded that the caller's report had provided the officers with reasonable suspicion that the driver of the truck had engaged in criminal, as opposed to innocuous, activity because the report noted that the driver had run the caller off the road in a telltale sign of unlawful drunk driving (see id. at 1690-1692).

The dissenting Justices concluded that the anonymous tip was not sufficiently corroborated to establish reasonable suspicion (see id. at 1692-1694 [Scalia, J., dissenting]). Noting that in White the Court had found an anonymous tip to be reliable based on the predictive information reported by the tipster, the dissent pointed out that no similar predictive information bolstered the tip accusing the Navarettes (see id. at 1693). The dissent stated, "The claim to 'eyewitness knowledge' of being run off the road supports not at all its veracity; nor does the amazing, mystifying prediction (so far short of what existed in White) that the petitioners' truck would be heading south on Highway 1" (id. at 1693 [emphasis in original]).

Otherwise, the dissent concluded that little, if anything, demonstrated the reliability of the 911 caller's report, and the dissent took issue with the majority's reliance on the caller's use of the 911 system, saying:

> "Finally, and least tenably, the Court says
> that another 'indicator of veracity' is the
> anonymous tipster's mere 'use of the 911
> emergency system.' . . . But assuming the
> Court is right about the ease of identifying
> 911 callers, it proves absolutely nothing in
> the present case unless the anonymous caller
> was aware of that fact. 'It is the tipster's

belief in anonymity, not its reality, that
will control his behavior.'  There is no
reason to believe that your average anonymous
911 tipster is aware that 911 callers are
readily identifiable." (id. at 1692-1694
[internal citations omitted] [emphasis in
original]).

In light of the majority and dissenting opinions in
Navarette, it is clear that, under the federal constitution,
predictive information is not an essential indicium of
reliability necessary to support a vehicular stop based on an
anonymous tip, for the tip in Navarette included no such
information.  Rather, other factors, such as a tipster's
statement indicating that he or she personally observed someone
engaged in suspicious behavior, may supply the requisite indicia
of reliability that allow the tip to serve as the basis for a
stop (see Navarette, 134 S Ct at 1688-1689).  Accordingly, our
passing comment in Moore that "[a]n anonymous tip cannot provide
reasonable suspicion to justify a seizure, except where that tip
contains predictive information" (Moore, 6 NY3d at 499) is no
longer an accurate statement of federal constitutional law (cf.
memorandum opinion at 2).  However, there remains a question as
to whether it should become the law of New York under the state
constitution.

B

In the wake of Navarette, the parties in the instant
cases propose various state constitutional tests for determining
whether an anonymous hearsay account of criminal activity is

sufficiently reliable to authorize a brief investigatory stop of a person or his or her automobile.  Defendants in all three cases urge us to hold that the state constitution forbids a police officer to detain a suspect based on an anonymous tip unless the tip contains predictive information.  In Argyris and DiSalvo, the People press for adoption of Navarette's totality-of-the-circumstances analysis as the law of New York.  Regardless of the proper baseline for the reliability of a tip supporting a stop, the People contend that we should not prevent the police from stopping a suspect based on a tip that complies with the Aguilar-Spinelli rule.  In Johnson, the People ask us to overrule our prior decisions adopting the Aguilar-Spinelli test for the reliability of a tip in the probable cause context.  Instead of the Aguilar-Spinelli standard, the People maintain, our state constitutional jurisprudence should employ the analyses in Gates and Navarette to determine whether an anonymous tip can create probable cause or reasonable suspicion.

I would not adopt wholesale the standards advocated by the parties under the state constitution.  Instead, for the reasons that follow, I would hold that, under the state constitution, the police may not rely on an anonymous tip to briefly detain or arrest a suspect unless the tip satisfies both prongs of the Aguilar-Spinelli test.

In our existing search and seizure jurisprudence under the state constitution, we have not set forth any clearly defined

minimum standard of reliability in an anonymous tip that permits a police officer to conduct a <u>DeBour</u>-level-three stop. Nonetheless, our longstanding practice of granting New York citizens enhanced protection against unwarranted police intrusions based on hearsay, which originally prompted us to incorporate the <u>Aquilar-Spinelli</u> rule into probable cause determinations, supports the extension of the <u>Aquilar-Spinelli</u> rule to the evaluation of a level-three stop.

In that regard, although the federal and state constitutions' search and seizure provisions first arose from a shared fear that the sovereign might oppress the governed by arresting them upon "common rumor and report rather than upon proof of reasonable grounds for believing a crime to have been committed" (<u>Elwell</u>, 50 NY3d at 236), this concern has taken on special significance under the state constitution (<u>see</u> <u>People v Grimminger</u>, 71 NY2d 635, 638-641 [1988]; <u>Johnson</u>, 66 NY2d at 406-407; <u>Elwell</u>, 50 NY2d at 241).  For that reason, we have rejected <u>Gates</u> and adhered to the <u>Aquilar-Spinelli</u> standard for evaluating the reliability of a tip as the basis for an arrest (<u>see</u> <u>People v Grimminger</u>, 71 NY2d 635, 638-641 [1988]; <u>Johnson</u>, 66 NY2d at 406-407; <u>Elwell</u>, 50 NY2d at 241).  And, the same concern that caused us to follow the <u>Aquilar-Spinelli</u> rule in the arrest context is still valid today and applies with equal force to investigatory stops precipitated by anonymous tips.  As is true of an arrest premised on uncorroborated anonymous hearsay, a stop based on an

unreliable tip may unjustly expose an individual to a high degree of physical intrusion without any credible cause for suspicion. If such stops were permitted, the police could freely abuse the people on authority of the most preposterous reports, and malicious tipsters could easily use incredible rumors to convince the police to physically harass the targets of the tipsters' ire. As in the arrest context, the state constitution must reduce these dangers by precluding the police from physically seizing an individual based on a tip that does not meet <u>Aguilar-Spinelli</u>'s reliability criteria.

In addition, the application of the <u>Aguilar-Spinelli</u> test to anonymous hearsay reports underlying investigatory stops furthers "the aims of predictability and precision in judicial review of search and seizure cases" (<u>Johnson</u>, 66 NY2d at 407). Because we have used the <u>Aguilar-Spinelli</u> test to judge the reliability of hearsay tips for the past 39 years (<u>see</u> <u>People v Hanlon</u>, 36 NY2d 549, 556 [1975]), defendants have relied on that standard as a basic guarantee of their rights, anchoring their expectations regarding the legality of a seizure and the admissibility of evidence obtained therefrom in the <u>Aguilar-Spinelli</u> framework.  Likewise, New York law enforcement officers have become accustomed to the need to conform their practices to the dictates of the <u>Aguilar-Spinelli</u> rule, and there is no evidence or logical basis on which to conclude that the law enforcement community has found the demands of the rule to be

incomprehensible or unusually burdensome.  Given that our state's jurists have also applied the Aquilar-Spinelli doctrine routinely and without apparent difficulty in the arrest context, they should be able to reliably and fairly employ that standard when deciding whether a tip is reliable enough to support a stop, thereby enhancing the predictability of judicial review.

Although defendants find the Aquilar-Spinelli test too lax and the People characterize it as too strict, both criticisms principally derive from a shared belief that the test's two prongs do not independently add much of value to the reliability determination and ignore other relevant indicia of reliability or flaws in a given tip.  My concurring colleague shares this concern (see opinion of Smith, J., concurring, at 3-4).  But our precedent readily answers those charges.  As we explained in People v Rodriguez (52 NY2d 483 [1981]) and People v DiFalco (80 NY2d 693 [1993]), each prong of the Aquilar-Spinelli test acts as a vital independent safeguard against unwarranted governmental intrusions based on unreliable hearsay.  The basis-of-knowledge prong guarantees that the police do not forcibly detain a citizen pursuant to the report of an informant who is honest but has relied on incomplete secondhand knowledge of the relevant events (see DiFalco, 80 NY2d at 698; Rodriguez, 52 NY2d at 491).  The veracity prong separately ensures that the police will not stop someone simply because an unscrupulous informant, who possesses plenty of accurate personal knowledge of what happened, twists

the facts to falsely accuse the suspect of a crime (see DiFalco,
80 NY2d at 698-699; Rodriquez, 52 NY2d at 488-490).  The twofold
framework accounts for the reality that a tipster's surfeit of
honesty cannot fully compensate for a deficit in his knowledge
(and vice versa), regardless of what other types of information
in the tip might be deemed indicia of reliability under
Navarette.  Thus, the Aquilar-Spinelli test's separate prongs
establish adequate protections against seizures based on
unreliable hearsay tips while simultaneously providing a
practical and analytically useful lens through which to view the
trustworthiness of such tips.

        The People ask us to abandon the Aguilar-Spinelli test
on the theory that its inflexibility has made it intolerably
difficult for the police to comply with.  The People claim that,
because every state in the Union, save for New York and five
others, has rejected the Aquilar-Spinelli standard and adopted
the Gates analysis, those other jurisdictions' experiences with
the Aguilar-Spinelli rule must have proven that the rule is
unworkable and wholly incompatible with effective law
enforcement.  However, while the considered opinions of other
jurisdictions often carry significant weight in our evaluation of
legal doctrine, I do not find the out-of-state authority cited by
the People to be a sufficiently compelling basis on which to cast
aside the Aquilar-Spinelli rule.  Those out-of-state decisions do
not compensate for the absence of proof that the Aguilar-Spinelli

rule has intolerably taxed the New York law enforcement community over the decades in which we have applied the rule.  And, although it is generally desirable to maintain uniformity with the law of other jurisdictions when doing so does not compromise a significant public policy or legal principle unique to New York, we have already held that considerations of uniformity in the evaluation of anonymous tips must yield to "aims of predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens," which are "best promoted by applying [the] State constitutional standards" embodied in the Aguilar-Spinelli standard (Johnson, 66 NY2d at 407).

For their part, defendants and my dissenting colleagues (see opinion of Rivera, J., at 2, 13-16) interpret Moore as creating a state constitutional rule that, even where a tip meets the Aguilar-Spinelli standard, it cannot support the temporary detention of a suspect if it does not also contain predictions of the suspect's future activities.  However, for reasons I have already explained, Moore does not establish such a state constitutional rule.  Nor do I now perceive any reason to create a special predictive information requirement under the state constitution because the Aguilar-Spinelli standard fully accounts for the value of the type of predictive information discussed in White and J.L.  As the Supreme Court noted in White, an anonymous tip containing predictive information is highly reliable

precisely because it shows "not only that the [tipster] [i]s honest," i.e., that his or her veracity is established, "but also that [the tipster] [i]s well informed," meaning he or she has a reliable basis of knowledge of the suspect's crime (White, 496 US at 332). In other words, a tip's prediction of the suspect's future activities is simply one of many possible pieces of information that can satisfy the basis-of-knowledge prong of the Aguilar-Spinelli test. Therefore, the presence or absence of predictive information in a tip already carries its proper significance in the Aguilar-Spinelli framework and need not be transformed into an independent prerequisite for a finding of reliability.

According to defendants, a predictive information requirement for the reliability of an anonymous tip is necessary to ensure that the police can "test" the credibility of the tip via their own observations of the behavior predicted by the tipster. However, when compared to other forms of information that satisfy the basis-of-knowledge prong of the Aguilar-Spinelli test, predictive information does not necessarily make the police more or less capable of "testing" the truthfulness of a tipster's account of the crime itself at the constitutionally critical juncture; even when armed with predictive information, the police still must usually decide whether to seize a suspect before they can personally observe that the suspect has committed or will commit a crime as described by the tipster.

_White_ illustrates this point.  There, the tipster gave the police exact predictions of the suspect's future movements and made an allegation that the suspect would be carrying a case full of drugs, but before detaining the suspect, the police did not personally observe her holding the case and were unable to test the truthfulness of the tipster's report that she possessed drugs (see _White_ 496 US at 327).  It was only after the police stopped the suspect and searched her car that they were able to confirm that the tipster had accurately reported the suspect's possession of the drugs (see _id._).  Hence, prior to the stop, the predictive information in the tip did not assist the police in "testing" whether the tipster had truthfully reported the suspect's illegal acts.  Thus, the facts of _White_ reflect the general truth that, regardless of whether an anonymous informant evidently knows about an individual's crime via personal affiliation or firsthand observation, the police usually cannot corroborate the informant's allegations of criminal conduct until they stop the suspect, and predictive information rarely resolves that difficulty.

In addition, a predictive information requirement would do little to eliminate the concern that a tipster will maliciously send false information to the police.  In that regard, only people with unique knowledge of a suspect's affairs, such as a close friend, relative, accomplice or insider in the suspect's criminal scheme, can provide the police with predictive

information, and consequently a predictive information requirement would force the police to rely exclusively on such insiders.  Yet, contrary to defendants' apparent supposition, insider tipsters are no less likely than members of the general public to concoct baseless accusations of criminality as a way to harass a suspect.  Indeed, one can conceive of many examples of a tipster who is familiar with a suspect's plans and might forward them to the police, along with a fabricated report of criminal activity, to settle a score.

Defendants' proposal to categorically forbid the police to conduct an investigatory stop predicated upon a tip that lacks predictive information would also place an excessive restraint on law enforcement.  Because members of "[t]he general public" who witness a crime "ha[ve] no way of knowing" what the perpetrator will do next (see White, 496 US at 332), they cannot supply any predictive information to the police, and therefore a predictive information requirement would prevent the police from seizing a suspect solely in reliance on a tip received from an ordinary citizen who wishes to report a crime while remaining anonymous. Given that many crimes are reported to the police exclusively in that way, defendants' rule would unacceptably curtail the punishment and prevention of numerous serious offenses that are credibly reported by regular citizens.  Like the Court (see memorandum opinion at 3), I cannot endorse this approach that senselessly endangers the public and erodes enforcement of the

law without any compelling justification.  I agree with my dissenting colleagues that the state constitution must provide robust protections for the rights of defendants, but the strong safeguards of article I, section 12 of the state constitution do not extend so far as to completely overthrow the sensitive balance between individual liberty and public order contemplated by the constitution.

In light of the considerations outlined above, I would conclude that the Aquilar-Spinelli test should govern the determination of whether an anonymous tip is sufficiently reliable to authorize the physical detention of a person by the police.

Of course, a court's finding that an anonymous tip is reliable under the Aquilar-Spinelli test does not end the inquiry into the lawfulness of a stop or arrest based on that tip.  After all, "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that criminal activity may be afoot" (Navarette, 134 S Ct at 1690 [internal quotation marks and citation omitted]).  Thus, as a matter of law and logic, an officer receiving an anonymous tip cannot stop the suspect unless the tipster's description of the suspect's criminal conduct includes such details as would create reasonable suspicion in an officer who had seen the same details or learned such facts from a fellow officer (see generally People v Hendricks, 25 NY2d 129, 136 [1969]).  Likewise, where the

tipster's statements about the actual crime feature the sort of details that would engender probable cause when gleaned by an officer via personal observation or another reliable source, the officer receiving the tip may lawfully arrest the suspect. Moreover, it is well settled that, even if a tip does not meet the Aquilar-Spinelli standard or does not feature adequate details to confer reasonable suspicion upon the officer who hears it, the officer's personal observation of the suspect engaged in suspicious activity may, in combination with the tip, give rise to reasonable suspicion or probable cause (see Elwell, 50 NY2d at 241 [concluding that, where an informant "d(oes) not indicate the basis of his knowledge," "the rule under our Constitution should be that a warrantless search or arrest will be sustained only when the police observe conduct suggestive of, or directly involving, the criminal activity"]).

                                III

        Having laid out relevant state constitutional guidelines, I now address the application of those rules to the facts of the cases before us.

                                A

        In Argyris and DiSalvo, I conclude that the police lawfully stopped defendants' car based on an anonymous tip that was reliable under the Aquilar-Spinelli test and sufficiently detailed in its description of their criminal conduct to create reasonable suspicion. On the reliability front, the 911 caller

who accused defendants Argyris and DiSalvo of having a gun in their car plainly supplied the police with information that satisfied the veracity prong of the Aquilar-Spinelli test. Since the "veracity prong of the Aquilar/Spinelli test may, in a proper case, be established through corroboration where the police have verified only noncriminal details of activity referred to in the informant's statement" (DiFalco, 80 NY2d at 699), the 911 caller's statements about numerous aspects of the suspects' appearance, vehicles and non-criminal activity, all of which were corroborated by the officers' observations of the same, fulfilled the veracity requirement.[2]

Turning to the basis-of-knowledge prong, that prong can be established, as it was here, by an anonymous informant's statement that he or she has just personally witnessed an

---

[2] Although the caller's demeanor, as reflected in the call, adds to his credibility, the mere fact that he called 911 contributes little, if anything, to the credibility determination. In that regard, I reject the Supreme Court's suggestion in Navarette that most people avoid giving false reports to a 911 operator because they know that the 911 emergency system can record their voices, telephone numbers and, maybe, locations (see Navarette, 134 S Ct at 1689-1690). Rather, I agree with the Navarette dissenters' conclusion that "[t]here is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable" in such a precise manner (see id. at 1694 [Scalia, J., dissenting]). At most, a 911 caller might have a vague inkling that, on the off chance the operator can deduce the caller's identity from the contents of the tip or somehow later learn the caller's identity from another source, the caller might face significant negative repercussions for lying in a 911 call. That awareness provides only the slightest additional indicium of the caller's credibility.

unconcealed crime.  Given that the report is allegedly
contemporaneous, the police can verify some aspect of the
informant's reliability by confirming that the individual accused
of criminality remains in the area reported by the tipster
shortly after the tip has been received.  By claiming personal
knowledge, the tipster puts his or her own credibility on the
line rather than seeking to hide behind a secondhand hearsay
source; the tipster knows that, if the police arrive on the scene
and see that the situation is not as described, they will
discredit the tip completely rather than assume that the error
resulted from the miscommunication of only a few details by
another individual who transmitted the information to the
tipster.  Furthermore, from the claim of eyewitness information
and the other contents of the tip, the police may discern whether
it is plausible for someone to have personally seen the
activities alleged under the circumstances in which they have
purportedly occurred.

For those reasons, contrary to the contention of my
dissenting colleagues (see opinion of Rivera, J., dissenting, at
15-18, 19-20), the tipster's roughly contemporaneous assertion of
an unconcealed criminal act may satisfy the basis-of-knowledge
prong of the Aguilar-Spinelli test in this context (see Spinelli,
393 US at 425 [White, J., concurring] ["[W]hat is necessary under
Aguilar is one of two things: the informant must declare either
(1) that he has himself seen or perceived the fact or facts

asserted; or (2) that his information is hearsay, but there is good reason for believing it"]; Brown v United States, 365 F2d 976, 979 [DC Cir 1966] [where police received a report of a robbery of a certain establishment from an anonymous victim, who allegedly personally witnessed the robbery, the basis-of-knowledge prong was satisfied]; People v Torres, 155 AD2d 231, 232 [1st Dept 1989] ["As to the second prong of the Aguilar-Spinelli test, the informant's basis of knowledge, that was easily established in that the informant stated that he was basing his report on his own personal knowledge, gained through direct observations"]; Commonwealth v Amral, 407 Mass 511, 514 [Mass 1990] ["The informant's observation of the contraband in the place to be searched satisfies the basis of knowledge test"]; cf. United States ex rel. Kislin v New Jersey, 429 F2d 950, 953-954 [3d Cir 1970] [indicating that affidavit stating an unidentified informant, who was not identified as a confidential informant with prior dealings with the police, had "personal knowledge" that defendants had been engaged in specified illegal gambling activities satisfied the basis-of-knowledge prong but not the reliability prong]).

Since the 911 caller here stated that he had acquired eyewitness knowledge of defendants' illegal weapon possession at around the time of the call, his report met the basis-of-knowledge prong.  Indeed, the caller's report was clearly contemporaneous, as he said that he was coming out of a building

at his current location when he saw one of the suspects put a gun

in the Mustang, and he added that the suspect "just went" down to

28th Street.[3]  Because the caller's tip satisfied both prongs of

the Aguilar-Spinelli test, the police were entitled to effect a

seizure in reliance on it, assuming that the tip contained enough

information about the crime to create reasonable suspicion.

        In that regard, as previously discussed, a tip that is

reliable under the Aguilar-Spinelli rule nonetheless cannot

authorize a seizure unless it also features a sufficient

description of the crime to give rise to reasonable suspicion, in

the case of a Terry stop, or probable cause, in the case of an

arrest.  Here, in addition to being reliable, the tip contained

enough information about the crime to create reasonable

suspicion.  Although a more fleshed-out report of criminal

activity would have been preferable, the tipster's basic

statements were sufficient in light of the nature of the crime

alleged.  In that respect, it should be noted that the crime at

issue, illegal gun possession, naturally tends to be described in

sparse fashion because it does not involve many detailed

movements, and one can accurately sum up someone's illegal gun

possession by saying the person is holding a gun in a public

---

[3]  Defendants do not include the words "just went" in their
transcription of the call in their brief, but those words are
discernable on the audio recording of the call admitted into
evidence at the hearing.  In any event, the context and contents
of the call as a whole indicated that the caller was making a
roughly contemporaneous report.

place. Even so, the caller here provided more than the typical
simplistic statement that someone "has" or "is holding" a gun.
The caller explained that: (1) one of the large white males
possessed a gun; (2) the gun was a "big gun"; and (3) the gun was
specifically placed in the back of the car. While not
overwhelmingly detailed, these allegations sufficed to supply the
police with reasonable suspicion that defendants and the other
occupants of the car were involved in unlawful gun possession
outside their homes or places of business (see Penal Law §§
265.01 [1]; 265.03 [1]; 265.03 [3]). Therefore, on this record,
the courts below did not err in finding that the police lawfully
stopped the car based on reasonable suspicion of illegal weapon
possession, in compliance with the state constitution.

When the police surrounded the car with officers, drew
their weapons and ordered defendants out of the car, they acted
reasonable and lawfully out of a justifiable concern for their
safety (see People v Brnja, 50 NY2d 366, 372 [1980]; see also
Terry, 392 US at 27; United States v Jackson, 652 F2d 244, 249
[2d Cir 1981], cert denied 454 US 1057 [1981]; see generally
People v Coutin, 78 NY2d 930 [1991]). Once defendant DiSalvo
emerged from the car with a gun visible on his waistband, Officer
Valles had probable cause to arrest him. Likewise, when
defendant Argyris exited the car wearing a bulletproof vest,
Valles had probable cause to believe that Argyris was also
involved in armed activity, as is often true of those who wear

bulletproof vests.  Because Valles's observations further corroborated the 911 caller's allegations that the men had guns in their car, Valles had the right to search the passenger compartment of the car for additional signs of the gun possession mentioned by the caller  (see Arizona v Gant, 556 US 332, 335 [2009]).  Upon doing so, Valles lawfully recovered ammunition in the back seat, corroborating the caller's claim that he had seen defendants or their companions place a gun in the back of the car.  Since the record does not support a finding that the police violated defendants' federal or state constitutional rights, I agree with the Court that the lower courts properly denied their suppression motions (see memorandum opinion at 2).[4]

B

In People v Johnson, I conclude that the police unlawfully stopped defendant's car based on an anonymous 911 call that did not set forth the basis of the caller's knowledge of defendant's alleged crime, as required under the second prong of the Aguilar-Spinelli test.  The caller did not claim to have personally witnessed defendant illegally driving while intoxicated, and the caller neither made any prediction of defendant's future behavior which might have suggested that he or she had insider knowledge of defendant's affairs nor stated that he or she had learned of defendant's acts from another credible

---

[4]  In light of this conclusion, I do not reach the People's alternative argument for upholding the stop based in part on the fellow officer rule.

source.  In the absence of any such indicia of the basis of his knowledge, Cunningham improperly relied on the 911 call as a basis for stopping defendant's car on suspicion of driving while intoxicated (see Spinelli, 393 US at 425 [White, J., concurring]; see also William II, 98 NY2d at 99).  Moreover, the caller's statements could not have caused Cunningham to reasonably suspect that defendant was committing a crime.  The caller made a conclusory and equivocal assertion that defendant was "sick or intoxicated," and he or she did not describe any particular action on defendant's part that could have reasonably caused the police to accept her conclusion.  Thus, the police could not have suspected defendant of anything more than "an isolated episode of past recklessness" (Navarette, 134 S Ct at 1690).[5]

---

[5]  The People have submitted to us an affidavit from the 911 caller, which she completed sometime after the call and in preparation for trial.  In the affidavit, the caller revealed her identity and described the circumstances that prompted her to call 911.  However, the People failed to present this evidence to Town Court at the suppression hearing, and we refuse to consider it.  As we have repeatedly made clear, on a direct appeal, the parties in a criminal action are bound by the contents of the record in the court of first instance, and we generally cannot consider matters which are outside the record developed below (see e.g. People v McLean, 15 NY3d 117, 121-122 [2010]; see generally Court of Appeals Rule of Practice 500.14; cf. People v Alomar, 93 NY2d 239, 247-248 [1999 [discussing the process by which a party may move to expand the appellate record and hold a reconstruction hearing]).  I would strongly admonish litigants in this Court that, if they do not request permission for reconstruction of the record, they are not to seek an unfair advantage over their adversaries by submitting to us materials that have not been tested in the crucible of adversarial proceedings in the court of first instance.

No. 198, 199, 210

In addition, while Deputy Cunningham saw defendant commit a traffic violation, he lacked authority to pull defendant's car over on this basis because he was outside his area of geographical jurisdiction and, thus, could stop a vehicle only on reasonable suspicion of conduct rising to the level of a crime. The violation did not confirm the reliability of the 911 call or provide Cunningham with reasonable suspicion of driving while intoxicated because, in context, defendant's behavior appeared to be, at most, a brief sign of negligent driving consistent with a minor traffic infraction. When defendant made an illegal wide turn onto the street to his right, he entered the lane meant for oncoming traffic for a mere moment, quickly correcting himself in a way that belied suspicion of intoxicated driving.[6] Furthermore, defendant's behavior prior to the stop also gave the deputy no cause to question his sobriety. When Cunningham first saw defendant, he was properly stopped at a stop sign, and defendant then evidently made a lawful and steady turn onto Route 21. Thus, the entirety of the record does not support the lower courts' finding that Cunningham reasonably suspected defendant of driving while intoxicated, and the courts below erred in concluding that Cunningham lawfully stopped defendant's

---

[6] I do not mean to suggest that a driver's commission of a traffic infraction cannot contribute to an officer's suspicion of intoxicated driving. But, here, defendant's specific conduct in committing the infraction could not have supplied him with enough additional suspicion to meet the legal threshold for reasonable suspicion.

car and questioned him.  And, because Deputy Drake's actions were precipitated by the unlawful stop, the breath test results obtained by Drake should have been suppressed.[7]

IV

In People v Argyris and People v DiSalvo, I find that the lower courts did not err in denying defendants' suppression motion.  In People v Johnson, I believe the lower courts erred in failing to grant defendant's suppression motion.  Accordingly, in People v Argyris and People v DiSalvo, I vote to affirm the respective orders of the Appellate Division.  In People v Johnson, I vote to reverse County Court's order, grant the suppression motion and dismiss the accusatory instrument.

---

[7]  On appeal, the People do not argue that Cunningham could have stopped defendant based exclusively on defendant's commission of the traffic infraction, notwithstanding that CPL 140.10 (2) (a) forbade Cunningham to arrest defendant for such a petty offense outside his territorial jurisdiction, or that the stop, even if it violated a jurisdictional statute, does not require suppression of the evidence (see Virginia v Moore, 553 US 164 [2008]).  In addition, the parties have not discussed the procedural aspects of such a potential claim, including any preservation issues and the possibility of a LaFontaine issue (see People v LaFontaine, 92 NY2d 470 [1998]) arising from County Court's express rejection of the notion that the traffic violation, without more, gave the deputy legal authority to stop the car.  Given that the People have not asked us to uphold the stop exclusively on authority of the traffic violation and there may be procedural obstacles to doing so, I express no opinion on any of the aforementioned matters, and the Court likewise does not address those issues (see memorandum opinion at 3).

People of the State of New York v Costandino Argyris
People of the State of New York v John DiSalvo
People of the State of New York v Eric R. Johnson

Nos. 198, 199, 210

READ, J. (dissenting in Argyris and DiSalvo, concurring in result in Johnson):

We have held that an anonymous tip supplies reasonable suspicion only if it "contains predictive information -- such as information suggestive of criminal behavior -- so that the police can test the reliability of the tip" (People v Moore, 6 NY3d 496, 499 [2006]; see generally Rivera dissenting op at 14-18 [discussing Moore]). In light of the United States Supreme Court's recent decision in Navarette v California (134 S Ct 1683 [2014]), the People urge us to dispense with the requirement for predictive information and adopt a totality-of-the-circumstances or some other more expansive test to justify a forcible stop based on an anonymous tip. These appeals therefore pose the question whether the police can have reasonable suspicion to stop an individual based solely on an anonymous tip that does not provide predictive information. I would adhere to our Moore precedent and answer "No."

Where to draw the line separating permissible from forbidden police conduct inevitably requires courts to balance the interests of individual privacy and liberty on the one hand and public safety and security on the other. This is usually not

- 1 -

an easy exercise with obvious answers.  That is certainly the case here, where Judge Smith's and Judge Abdus-Salaam's concurrences and Judge Rivera's dissent all make excellent arguments in support of the different standards that they espouse.  And <u>Navarette</u> itself was a vigorously disputed 5-4 decision.  I recognize, of course, that we might have decided <u>Moore</u> differently if, at the time, federal constitutional law had allowed us to do that.  Still, the <u>Moore</u> rule is clear, reasonable and well-established.  I therefore see no reason to depart from it.

People of the State of New York v Costandino Argyris
No. 198

People of the State of New York v John DiSalvo
No. 199

People of the State of New York v Eric R. Johnson
No. 210

RIVERA, J.(dissenting in Argyris and DiSalvo, concurring in Johnson):

In these cases we must decide whether police have reasonable suspicion to justify a forcible stop based solely on an anonymous informant's uncorroborated "tip" that lacks any information by which to test the reliability of the informant or the information supplied. Information from informants, in particular anonymous informants who intentionally keep their identity secret and with whom law enforcement personnel have no known prior experience, is inherently suspect. The value of an informant's tip has always depended on the credibility of the informant and the basis of the tip information. Where, as here, an anonymous informant makes unsubstantiated assertions about illegal activity, providing only generally observable descriptive information about the individual subject of the tip, but lacking predictive information of the subject's criminal conduct, the tip alone cannot provide reasonable suspicion for police to effect a

- 1 -

forcible stop.

Anonymous tips, nonetheless, may advance law enforcement purposes by providing information leading to an independent police investigation. In cases where an anonymous tip is confirmed by police work and personal observation, the tip, as corroborated, may supply reasonable suspicion, which is "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand" (People v Cantor, 36 NY2d 106, 112-13 [1975]).

In People v Moore, we held that in order to justify a forcible stop, an anonymous tip must "contain[] predictive information -- such as information of criminal behavior -- so that the police can test the reliability of the tip" (6 NY3d 496, 499 [2006]). Four members of the Court now reject Moore's precedential standing. In turn, a bare majority, unable to choose between a totality of the circumstances analysis and a diluted version of the Aquilar-Spinelli test, concludes in a memorandum opinion that under either standard the tip in Argyris and DiSalvo supports a finding of reasonable suspicion, but the tip in Johnson is unreliable. In separate concurring opinions, two members of the majority provide rationales in support of their legal standard of choice.

It appears that my colleagues accept as a legal precept the sufficiency of an informant's untested and unsubstantiated

allegation of personal knowledge of criminal activity as a basis for a tip's reliability. By doing so, my colleagues bolster the constitutional significance of an uncorroborated anonymous tip that provides nothing more than a self referential statement that the informant saw some individual commit a crime. Such an approach places every member of our society at risk of police intrusions based on the flimsiest of bases, and is contrary to our prior holding in Moore. I dissent.

I.

The appeals before us involve information from anonymous tipsters, persons not known to law enforcement and who seek to conceal their identity. Anonymous tipsters differ from known police informants, whose identities are not secret, and with whom police may have prior experience as reliable sources of information about criminal activity. In either case, informants, unlike police officers, "are not regarded as presumptively reliable or honest" (Illinois v Gates, 462 US 213, 277 [1983] [Brennan, J., dissenting]). The case law illustrates a general concern about the use of information from informants, in particular anonymous tipsters, as a basis for police intrusions because of the ease with which anonymity facilitates false reporting (see e.g. People v Rainey, 228 AD2d 285, 287 [1st Dept 1996] ["The lack of accountability for false reports in such instances renders anonymous tips the weakest sort of information"] [citation omitted]). In contrast, a known

informant's "reputation can be assessed and [the informant] can be held responsible if [the] allegations turn out to be fabricated" (<u>Florida v J.L.</u>, 529 US 266, 270 [2000], citing <u>Adams v Williams</u>, 407 US 143, 146-47 [1972]).

In order to provide a basis for probable cause to arrest, or reasonable suspicion to stop and detain the subject of a tip, courts have applied tests by which to measure the tip's reliability.  The necessary indicium of reliability demanded in these cases focus on the informant's credibility and the basis of the tip information.

The <u>Aguilar-Spinelli</u> test, drawn from the United States Supreme Court's decisions in <u>Aguilar v State of Tex.</u> (378 US 108 [1964]) and <u>Spinelli v United States</u> (393 US 410 [1969]), as applied to probable cause determinations based on information from known informants, requires that the informant is reliable and that there is a basis for the knowledge of the informant's tip (<u>Spinelli</u>, 393 US at 413, 416).  To avoid unreasonable police intrusions, the informant's basis of knowledge must be supported by details substantial enough to demonstrate that the informant is not merely relying on rumor (<u>id.</u>).

In both <u>Aguilar</u> and <u>Spinelli</u>, the court found the informants' tips constitutionally insufficient.  In <u>Aguilar</u>, the affidavit stated only that the police were informed by an unnamed "credible person" that defendant's home contained illegal drugs (378 US at 109). In <u>Spinelli</u>, the affidavit stated more,

including that defendant was observed by investigators traveling repeatedly to a particular apartment that contained two telephone lines, that defendant was known to the affiant and other law enforcement agents as a bookmaker, and that an unidentified informant had stated that defendant was using the two telephones in a bookmaking operation (393 US at 413-4).  Nevertheless, each failed to satisfy the threshold requirements.

In Gates, the Supreme Court abandoned the Aquilar-Spinelli test, demoting its two requirements to mere considerations in a broad "totality of circumstances" analysis (462 US at 238).  There, the court considered the reliability of an anonymous letter sent to police by mail.  The letter contained specific information detailing the "future actions of third parties ordinarily not easily obtained" (id. at 245).  The court found that the anonymous letter alone was insufficient under Aquilar-Spinelli.  However, police "corroboration of major portions of the letter's predictions" provided "fair probability that the writer of the anonymous letter had obtained his entire story either from [defendants] or someone they trusted," therefore making it apparent that the judge had a substantial basis for concluding that probable cause to search [defendants'] home and car existed" (id. at 246)

The court applied the totality of circumstances analysis in Alabama v White, where it held that in order for an anonymous tip to provide reasonable suspicion to justify a

vehicle stop, the tip needed some "indicia of reliability" (496

US 325, 327 [1990]). There, police received an anonymous call

indicating:

> "[the defendant] would be leaving 235-C
> Lynwood Terrace Apartments at a particular
> time in a brown Plymouth station wagon with
> the right taillight lens broken, that she
> would be going to Dobey's Motel, and that she
> would be in possession of about an ounce of
> cocaine inside a brown attaché case"

(id.). Acting on the tip, police proceeded to the Lynwood

Terrace Apartments and observed a brown Plymouth station wagon

with a broken tail light in front of building 235 and observed

defendant enter that vehicle and proceed to drive towards the

Dobey Motel. Prior to defendant's arrival at the hotel, police

pulled her over and informed her of the accusation that she was

carrying drugs. Defendant consented to the search of her vehicle

and cocaine was discovered in a locked, brown attaché case (id.).

Calling it a "close case," the court reasoned that the predictive

information of defendant's actions provided by the informant,

coupled with the police surveillance and corroboration of the

events predicted, supplied the necessary reasonable suspicion to

justify defendant's stop (id. at 331). The court concluded there

was no basis upon which the police could determine the

reliability of the tipster or the information without independent

investigation, meaning following the car and corroborating by

police observations the tipster's description of future criminal

conduct. With such corroboration, the court found the police

possessed the requisite reasonable suspicion to justify the automobile stop (id. at 332).

In Adams v Williams, the informant was known to the police officer when he approached the officer and advised him "that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist" (407 US at 143). The court noted that the information provided was immediately verifiable and, if false, subjected the informant to immediate arrest thus making this "a stronger case than obtains in the case of an anonymous telephone tip" (id. at 146). The court stressed, however, that "[o]ne simple rule will not cover every situation" and "[s]ome tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized" (id. at 147).

In Florida v J.L. (529 US 266 [2000]), the Supreme Court clarified that to justify a forcible stop, reasonable suspicion based on an anonymous tip required predictive information of future criminal behavior. There, police officers stopped and frisked the defendant after receiving an anonymous tip that a young Black male was standing at a particular bus stop, wearing a plaid shirt and carrying a gun. Other than the fact that the defendant matched the general description provided by the informant, the officers had no reason to suspect him or his companions of illegal activity. Finding the informant's

descriptive information of defendant insufficient to satisfy the constitutional requirement for a stop and frisk, the court stated that an anonymous tipster's reliability would be demonstrated only if the suspect subsequently engaged in actions suggestive of concealed criminal activity, which the anonymous tip predicted in detail (id. at 271-272).  That is "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person" (id. at 272).

The Supreme Court revisited the issue of the reliability of anonymous informant's in the context of a drunk driving case.  In Navarette v California (134 S Ct 1683 [2014]), a divided court applied the totality of the circumstances test, and concluded that while police failed to observe any criminal conduct, they had reasonable suspicion to stop the defendants based on a 911 caller's description of defendants' pickup truck which the caller alleged had minutes before run her off the road.[1]  According to the majority, the call had sufficient indicia of reliability because the informant had been an eyewitness to the event, whereas in J.L., "the tip provided no basis for concluding that the tipster had actually seen the gun"

_____

[1]It appears that the informant did in fact give her name, but the prosecution failed to produce either the informant or the dispatcher who received the call at the hearing and, thus, the court was inclined to treat the caller as anonymous (see Navarette, 134 S Ct at 1687, n 1).

(id. at 1689).  Further, the court credited the informant with
having used the 911 system, which permits tracking of calls, and
which allows for prosecution of those who make false reports.
Last, the court noted that the caller reported the type of
dangerous conduct that resembles drunk driving, suggesting the
informant's conclusion was correct.

        Our Court has also been suspicious of informants,
especially anonymous tipsters, and thus demands that the
informant's reliability be established in order to justify
probable cause or reasonable suspicion.  Early on we
"characterized the use of anonymous information to justify
intrusive police action as 'highly dangerous'" (People v De Bour,
40 NY2d 210, 225 [1976], citing People v Taggart, 20 NY2d 335,
343 [1967]).  Fearing the potential risks associated with false
anonymous tips, we observed that:

> "A citizen walking our streets should not,
> without more, be exposed to physical assault
> by a police officer on the basis of an
> unsubstantiated report of the mere possession
> of firearms volunteered by a stranger. To
> condone such conduct would be to expose
> innocent persons to harassment by pranksters
> and irresponsible meddlers"

(People v Green, 35 NY2d 193, 196 [1974]).

        In People v La Pene, III (40 NY2d 210 [1976]), the
companion case to De Bour, we concluded that an anonymous
telephone tip, in the proper case, could provide police with
reasonable suspicion to stop and frisk the subject of the tip.
However, we held that the tip in La Pene, alleging only that

there was a Black male inside a bar, wearing in a red shirt with a gun (id. at 221), was vague and thus insufficient.  We noted that it was "significant though not determinative . . . that [the tip] was garnered from an anonymous source" (id. at 224).

Even where the informant had provided reliable information in the past, we have declined to uphold a search where the police were only able to corroborate defendant's identification, but not any details suggestive of criminal activity (People v Elwell, 50 NY2d 231, 234 [1980] ["personal police observation corroborative of data received from the informant should be regarded as sufficient only when the police observe facts suggestive of criminal activity"][emphasis added]). We reasoned that "[o]therwise, privacy and liberty may be invaded by a warrantless search or arrest based solely on the quality of the informant and not at all on the quality of the information, i.e., its suggestiveness of criminal activity" (id. at 237). Thus, "[b]earing in mind the balance to be struck between the individual's constitutional right to be free of official interference by way of search or arrest with society's interest in preventing crime and apprehending criminals" (id. at 241), we concluded that:

> "the rule under our Constitution should be
> that a warrantless search or arrest will be
> sustained only when the police observe
> conduct suggestive of, or directly involving,
> the criminal activity about which an
> informant who did not indicate the basis for
> his knowledge has given information to the
> police, or when the information furnished

about the criminal activity is so detailed as
to make clear that it must have been based on
personal observation of that activity"

(id. [citations omitted]).

After the Supreme Court's decision in Gates, we
rejected the totality of the circumstances test and, as a State
constitutional matter, continued to apply the Aquilar-Spinelli
test to probable cause determinations involving informants.
Thus, in People v Johnson, we stated that "the protection of the
individual rights of our citizens [were] best promoted by
applying State constitutional standards" (66 NY2d 398, 407
[1985]).  Soon thereafter, in People v Griminger (71 NY2d 635
[1988]), we again adhered to Aquilar-Spinelli, observing that
requiring adherence to the test would "prevent the disturbance of
the rights of privacy and liberty upon the word of an unreliable
hearsay informant, a danger we perceive under the Gates
totality-of-the-circumstances test" (id. at 641).

Distinguishing between the two Aquilar-Spinelli
requirements, we restated in People v DiFalco (80 NY2d 693
[1993]) that the informant's basis of knowledge could be
corroborated by sufficient details "suggestive of or directly
related to criminal activities" (id. at 697, citing Elwell, 50
NY2d at 236).  We then held that the informant's reliability may
be established by corroboration based on "independently verified
details, although not of themselves criminal in nature" (id. at
699).  We stressed, however, that those details "may not be

merely peripheral to the reported criminal scheme; they must fit
within the informant's story of the contemplated crime as
activities which are significant and essential to carrying it
out" (id.).  Thus, we confirmed that information suggestive of
criminal activity was central to the Aquilar-Spinelli
requirements, finding "[t]he separate basis of knowledge and
veracity requirements of Aquilar-Spinelli are analytically
independent and each must be satisfied" (id. at 697; see also
Johnson, 66 NY2d at 403-03; United States v Harris, 403 US 573,
592 [Harlan, J., dissenting]).

In three cases particularly relevant to the instant
appeals, we imposed explicitly the predictive information
requirement of J.L. to street encounters and vehicle stops.  In
People v William II (98 NY2d 93 [2002]), the police received an
anonymous call indicating a man named "Will" had just been
involved in a drive-by shooting.  The anonymous informant
provided a description of "Will," as well as his location, and
cautioned that he was armed.  When police arrived they found
defendant in a group, with another man resembling the description
given by the caller; however from the manner in which defendant
was dressed, the police immediately knew he was not carrying a
concealed weapon.  Nevertheless, the police frisked defendant and
the other man.  We held that "[t]he tip not only lacked
predictive information that would permit the police to test the
caller's knowledge, but was also rendered suspect when directly

contradicted by the police officer's observation[s] . . ." (id. at 99). Accordingly, we suppressed marijuana recovered from the defendant.

In People v Rodriguez, the companion case to William II, an anonymous caller described a light-skinned Hispanic male, in his twenties, with black hair, wearing a black-and-white checkered shirt and jeans and allegedly carrying a gun. Two hours later the police saw the defendant, who fit the description, entering the back of a livery cab. Police stopped the cab and as they approached, defendant allegedly dropped a handgun out of the window. We held that the anonymous tip lacked predictive information, stating "the only basis for reasonable suspicion advanced before the suppression court for stopping the vehicle in which defendant was a passenger was that he matched the physical description provided by an anonymous tipster. Without more, the tip could not provide reasonable suspicion to stop the car" (id.).

In People v Moore (6 NY3d 496 [2006]), an anonymous caller informed police that there was a dispute involving a Black male with a gun, approximately 18 years old and wearing a gray jacket and red hat. When the police arrived they saw defendant, who matched the description. As they approached, defendant started to walk away. The police caught up with defendant and, with guns drawn, subjected him to a frisk. We held that "[a]n anonymous tip cannot provide reasonable suspicion to justify a

seizure, except where that tip contains predictive information --
such as information suggestive of criminal behavior -- so that
the police can test the reliability of the tip" (id. at 499,
citing J.L., 529 US 266).

In assessing the propriety of a forcible stop under our
De Bour framework, we discussed the liberty interest at risk from
investigatory stops based on anonymous tips.  We observed

> "the very right to be let alone — the right
> of citizens not to be stopped at gunpoint by
> police, based on anonymous tips—is the
> distinguishing factor between the level of
> intrusion permissible under the common-law
> right of inquiry and the right to stop
> forcibly . . .
>
> "Under our settled De Bour jurisprudence, to
> elevate the right of inquiry to the right to
> forcibly stop and detain, the police must
> obtain additional information or make
> additional observations of suspicious conduct
> sufficient to provide reasonable suspicion of
> criminal behavior . . ."

(Moore, 6 NY3d at 500-01 [internal citations omitted]).


                              II.

Central to these cases are the requirements of
reliability of the anonymous informant and the credible basis for
the tipster's information.  Testing the reliability of the
informant addresses whether the informant is truthful, and not
motivated to fabricate.  Confirming the tipster's information
reflects a principal concern that the information about criminal
activity be based on facts and data which make it likely to be

accurate.

Whether under the <u>Aquilar-Spinelli</u> test for probable cause, or the less demanding reasonable suspicion standard, the courts seek to ensure a tip is reliable in order to avoid police intrusions based on suspicion and rumor, or fabricated report of illegality. Unlike a known informant, an anonymous informant has no history with law enforcement, and no track record of having provided reliable information in the past. Deprived of the informant's identity, the police have no basis upon which to conclude that the tipster may be trusted. As the courts have recognized, such tips carry the real possibility that individuals will be subjected to police intrusions on the basis of false information by someone who may escape prosecution. Thus, there is every reason to carefully scrutinize the anonymous informant and the tipster's information, and to require corroboration that provides a basis for an officer's supported belief of criminal conduct, taking into account that the source of the information is unknown and untested. Whether the inquiry is to confirm the existence of probable cause for a search or an arrest, or the reasonable suspicion to stop and detain, the tip must have an indicium of reliability.

Reliability may be provided by any number of factors external to the informant (<u>see</u> <u>White</u>, 496 US at 325 [police observation of predictive details evincing the criminal behavior the tip predicted]; <u>People v Cobb</u>, 208 AD2d 453 [1st Dept 1994]

[police observation of illegality]).  Reliability may also be
provided by the contents of the tip (see e.g. White, 496 US at
328 [substance of the anonymous tip contained sufficient indicia
of reliability to justify reasonable suspicion to stop
defendant]).  However, as relevant to these appeals, we made
clear in Moore that in order to provide reasonable suspicion to
justify a forcible stop, an anonymous tip must contain predictive
information of criminality (6 NY3d at 499).  It is just that
simple and just that important.

The requirement that an anonymous tip must contain
predictive information ensures that police act based on
information that provides a basis for believing the informant is
truthful and the tip has a basis in facts and circumstances that
reveal criminal activity.  This requirement properly balances
fundamental constitutional rights of liberty and privacy against
concerns about public safety and efficient law enforcement.  A
predictive information requirement benefits the individual and
society by protecting cherished freedoms against what Justice
Douglas described as "the powerful hydraulic pressures throughout
our history that bear heavily on the [courts] to water down
constitutional guarantees" (Terry v Ohio, 392 US 1, 39 [1968]),
while also permitting law enforcement to deploy investigative
techniques based on experience with informants, with due regard
to the practical realities and demands of policing, especially in
matters involving fast-paced street encounters.

In an effort to avoid the underlying rationale of our prior approach, the majority claims in Argyris and Disalvo that the tip's lack of predictive information is not fatal(memorandum op. at 2). My concurring colleague, Judge Abdus-Salaam, goes so far as to describe as dicta Moore's legal rule statement that an anonymous tip must contain predictive information before the tip may serve as reasonable suspicion to justify a De Bour level three seizure (see opinion of Abdus-Salaam, J., at 19). Indeed, she expounds on this conclusion, arguing that the actual grounds for our decision in Moore were "numerous other aspects of the tip" that showed it was not credible (id.). This is a revisionist interpretation of Moore and one which distorts this Court's central unambiguous holding that "the tip did not provide any predictive information . . ." (Moore, 6 NY3d at 499). In fact, there are no so-called "numerous" references to credibility problems to be found anywhere in the opinion, only this Court's conclusion that in addition to lacking predictive information, the tip failed to provide accurate descriptive information by failing to correctly portray the unfolding events at the scene.

Judge Abdus-Salaam advocates for the adoption of the two-pronged Aquilar-Spinelli test. If she, in fact, adhered to the actual Aquilar-Spinelli test I might join her opinion, given that before today the Aquilar-Spinelli test imposed a higher standard than what has usually been necessary to establish reasonable suspicion in support of an investigatory stop.

However, the long-standing <u>Aguilar-Spinelli</u> test is not what my concurring colleague promotes.  Instead, she embraces a modified version of this test, resting the reasonable suspicion determination "on the quality of the tip's description of the crime itself," without the need for predictive information of criminal activity.  This is merely "<u>Aguilar-Spinelli</u> lite," excised of the core protective benefits that underlie the original test, and diluting its most salient requirements.

As described, it allows police, on a simple allegation that someone saw somebody do something, to stop anyone, regardless of age or physical condition; at any time, day or night; at any place, whether walking on a public street, sitting in a car, or entering one's home or place of employment.  No quotidian moment escapes potential police intrusion.  The most basic and innocuous of chores and activities, such as commuting to work or school, purchasing food at the market, waiting at the laundry mat, standing in line at the post office, visiting the library, browsing through records and books, or circling the neighborhood in a car looking for parking for what seems like an interminable length of time, may serve as the basis for an anonymous informant to claim criminal activity.  So long as the informant claims to have been an eyewitness to a criminal act, the tip need not provide even a modicum of reliability as to the alleged illegality, even though the tip is communicated outside the physical presence of law enforcement personnel, asserted by

an unknown individual who is unwilling or unable to provide identifying information, such as a telephone number, and whose veracity is unproven and unconfirmed.

The People in Argyris and DiSalvo, claim that predictive information is unnecessary because the anonymous informant's alleged personal observations of the claimed criminal activity. As this argument goes, the informant is reliable because in addition to describing the car and the defendants, the informant said that he saw one of the men put a gun in the back of the car.

My concurring colleague agrees, and offers four grounds to support her conclusion (see opinion of Abdus-Salaam, J., at 24-33). First, as the People here contend, predictive information is but one way to establish basis of knowledge under the Aquilar-Spinelli test. As such, an anonymous informant may establish basis of knowledge by a statement of personal observation of illegal conduct, as is the case in these appeals.

The appropriate response to the People's argument is that of the dissent in Navarette to a similar claim of alleged personal observation. Reacting to the Navarette majority's assertion that the informant claimed to have been run off the road and therefore had eyewitness knowledge, Justice Scalia remarked, "So what?" (Navarette, 134 S Ct at 1693 [Scalia, J., dissenting]). For, "[t]he issue is not how [the informant] claimed to know, but whether what [the informant] claimed to know

was true" (<u>id.</u>).  To that question, "[t]he claim to 'eyewitness knowledge' . . . supports <u>not at all</u> its veracity" (<u>id.</u> [emphasis in original]).

A simple example, comparing a tip from an informant who claims to have personal eyewitness knowledge to alleged gun possession, with a tip from an informant who makes no such assertion, reveals the strained logic of the argument.  A self-referential statement of eyewitness observation of criminal activity, summed up in the words "I saw a gun", sheds no greater light on whether the informant is to be trusted and the tip relied upon, than does the same statement, from the same informant, but without the claim of having seen a weapon.  In both scenarios, the police have only the informant's word as to what occurred, and no way to confirm it, without engaging in independent police investigation.

Accepting self-verification based on no more than the informant's bald unsubstantiated assertion goes against common sense because such statement proves nothing and adds nothing to the reliability analysis.  It does, however, increase the risk of police intrusions based on fabricated information by legitimating police action that is based on an anonymous tip that says nothing more than "I saw something so I said something."[2]

_____

[2]The anonymous informant in <u>Argyris</u> and <u>DiSalvo</u> used this phrase when speaking to the 911 operator, apparently a reference to public service announcements encouraging members of the general public that "if you see something, say something" as a

My colleague's second ground for rejecting a requirement of predictive information is that the requirement supposedly fails to assist police in testing the truthfulness of the informant's account of the criminal activity prior to taking action against the subject of the tip.  Yet, the fact that an anonymous tip may not provide police with reasonable suspicion of criminal activity is the very reason why courts demand more than unsubstantiated assertions from unknown persons.  As has been the case for decades, where police receive an anonymous tip the police may determine, based on the content of the tip and police experience and expertise with anonymous informants, whether and how to follow up on the anonymous information.  If, by independent investigatory police work and their personal observations, the police corroborate the readily observable, innocuous noncriminal information provided by the informant, and also confirm the basis for the informant's allegations of criminal activity, such that the police "believe criminal activity is at hand," the police may conduct an investigatory stop.  If the police fail to confirm the tip, even under the lower threshold of reasonable suspicion, then they may not act. The fact that the police may be unable to corroborate an anonymous tip is a consequence of our society's choice to protect constitutional rights.

---

response to suspicious items or activities (see generally If You See Something, Say Something, http://web.mta.info/mta/security/[accessed Nov. 13, 2014]).

The third ground asserted is that predictive information will not eliminate the risk that malicious tipsters will fabricate reports of criminal activity, and may very well increase that risk. The reason being, that those most likely to have predictive information are those closest to the tipster's target, and they are as likely as anyone else to make up a story. Moreover, where the informant bears personal animosity towards the target, the informant may be motivated to lie. This is pure speculation and conjecture. The reality is that the tests for constitutional sufficiency of informant tips seek to reduce the possibility of fabrication by requiring information that is intended to permit police and courts to weed out the genuine tips from those motivated by a personal agenda. Police have a long history of distinguishing the malevolent from the honest informant. That task is made harder when the informant is anonymous, and thus requires that police have information to assist them in determining what is a genuine source of reliable information.

As a fourth ground, my colleague asserts that a predictive information requirement would place an excessive restraint on law enforcement, imperiling public safety. Of course, we do not want to interfere unduly with police work. The concern as explained, however, sounds like fearmongering. Even if members of the general public who observe a crime have no way of knowing what the subject of the tip will do and cannot provide

predictive information, that does not mean, as posited, that serious crimes would go unpunished. Unlike my colleague I place my faith in a law enforcement system that relies on the work of police officials, trained and experienced in investigatory techniques, familiar with the street hustles and the fake claims of imminent danger, rather than in unsubstantiated tips from anonymous persons.

Despite claims that the only way to avoid endangering the public and prevent the erosion of law enforcement is to cede our hard-fought rights to liberty and privacy, the truth is just the opposite. Police intrusion based on untested and uncorroborated claims of criminal conduct does not safeguard the public or encourage effective law enforcement. I reject the premise that it is simply too difficult for law enforcement to do what they are trained to do, and that it is too much to expect that those charged with protecting us will do so by applying their skills in accordance with constitutional and statutory requirements.

My concurring colleague, Judge Smith, opposes the application of the Aquilar-Spinelli test, and in its stead would apply the totality of the circumstances test (opinion of Smith, J., concurring, at 2, 4). However, we rejected that federal approach in Johnson, finding our State constitutional standards better protected individual rights (see 66 NY2d at 407). That assessment of the totality test is still applicable today and I

see no reason to reconsider and resuscitate a standard buried long ago.


                                III.

        Some states and law enforcement have argued for years that tips about illegal guns should be treated differently, and absolved of the usual constitutional requirements of reasonable suspicion and probable cause (see e.g. J.L., 529 US at 271).  We have never, at least until now, found support in fact or logic for such an exception to the general rule that police intrusions of liberty require a showing of reasonable suspicion to support an investigatory stop, or probable cause for a search and an arrest.

        In J.L., the Supreme Court rejected such entreaties to carve out a "firearm exception" that would permit a stop and frisk based on a tip that would not otherwise provide a constitutionally justifiable basis for the stop (id. at 272).  After recognizing that "firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions," Justice Ginsburg noted that the Terry rule sought to address these concerns by permitting a protective police search based on reasonable suspicion rather than probable cause.  She then stated

>         "an automatic firearm exception to our
> established reliability analysis would rove
> too far.  Such an exception would enable any
> person seeking to harass another to set in
> motion an intrusive, embarrassing police
> search of the targeted person simply by

> placing an anonymous call falsely reporting
> the target's unlawful carriage of a gun"

(id. at 272).  She also recognized the difficulty of cabining

such an exception to firearm prosecutions because, as federal

Circuits Courts of Appeals have found, it is "foreseeable for

people carrying significant amounts of illegal drugs to be

carrying guns as well" (id. at 273 [citations omitted]).  She

continued:

> "If police officers may properly conduct
> Terry frisks on the basis of bare-boned tips
> about guns, it would be reasonable to
> maintain [based on the caselaw] that the
> police should similarly have discretion to
> frisk based on bare-boned tips about
> narcotics.  As we clarified when we made
> indicia of reliability critical in Adams and
> White, the Fourth Amendment is not so easily
> satisfied"

(id., citing Richards v Wisconsin, 520 US 385, 393-394 [1997]

[rejecting a per se exception to the "knock and announce" rule

for narcotics cases partly because "the reasons for creating an

exception in one category [of Fourth Amendment cases] can,

relatively easily, be applied to others," thus allowing the

exception to swallow the rule]).

My colleagues go further because they would apply the

totality of circumstances or Aquilar-Spinelli tests to all

investigatory stops, not just those involving guns.  Such

approach risks the further watering down of rights in the future.

IV.

Turning to the instant appeals, in Argyris and DiSalvo,

I would find that the anonymous tip lacked the indicia of reliability necessary to support reasonable suspicion to forcibly stop defendants.  The informant provided descriptive information of the defendants, the car and van and the route they were taking when he last observed them.  This information was readily observable to anyone on the street. The tip lacked predictive information as to the criminal activity alleged because the informant stated only that he had seen one of the men put a gun in the back of the car.  Without more, the tip lacked information to establish the reliability of the allegation of gun possession.

To the extent my colleagues accept the veracity of the anonymous informant based on the informant's word they ignore the primary lessons of federal and state cases that anonymous tips are inherently suspect and cannot, on their own, serve as a basis for police intrusions.  Equally unavailing is my concurring colleague's assertion that "[b]y claiming personal knowledge, the tipster puts his or her own credibility on the line rather than seeking to hide behind a secondhand hearsay source . . ." (opinion of Abdus-Salaam, J., at 36).  This completely fails to comprehend that because the informant is anonymous, there is no way to assess credibility unless the tip contains predictive information that affords police the ability to corroborate the substance of the tip.  An anonymous source, immune from prosecution for false statements, places nothing "on the line."

Here, because the tip on its own was insufficient to provide reasonable suspicion, the police were left to investigate and determine whether additional information confirmed the tip. This is what several officers did, and this was good police work because they were able to corroborate the descriptive information by personal observation. However, before they could corroborate the allegation of gun possession Officer Valles stopped defendants' car at gunpoint. As the record makes clear, the only information known to officer Valles when he initiated the stop was the contents of the tip: the descriptive information and the bare assertion of the presence of a weapon. Plainly, at this point, the police lacked reasonable suspicion to forcibly stop defendants' vehicles. Therefore, despite the majority's conclusion otherwise, there is no record support for the finding below (see memorandum op. at 2). Indeed, even under a totality of the circumstances analysis, there are too few details in the aggregate to support a finding of reasonable suspicion (see id.; see also opinion of Smith, J., at 4). As a consequence, the subsequent search was unlawful and the evidence seized during the course of the search should have been suppressed (see William II., 98 NY2d at 100).

The anonymous tip in Johnson is also constitutionally deficient because it too lacked predictive information about the alleged criminal activity of driving while intoxicated, and the police failed to observe conduct that would suggest the tip was

reliable.  Based on slightly different legal grounds I agree with the majority that County Court should be reversed and the motion for suppression granted.  I, therefore, concur in the result.

V.

My colleagues accept a standard below any constitutional floor this Court has ever recognized.  In so doing they reject Moore without legal justification or good reason.  They also conveniently disregard our long-standing interpretation of our State Constitution's expansive protections (see e.g. People v Weaver, 12 NY3d 433, 445 [2009]), and ignore the concerns about anonymous informants expressed in our prior case law.  In my opinion, we must remain ever mindful of this Court's statement in Elwell, regarding the power of the state to arrest, and which applies with equal force to lesser police intrusions, that reliance "on mere suspicion collides violently with the basic human right of liberty.  It can be tolerated only in a society which is willing to concede to its government power which history and experience teach are the inevitable accoutrements of tyranny"  (Elwell, 50 NY2d at 236 [citation omitted]).  I dissent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>For Cases No. 198 and No. 199</u>:  Order affirmed, in a memorandum.
Judges Graffeo, Smith, Pigott and Abdus-Salaam concur, Judge
Smith in a separate concurring opinion in which Judge Pigott
concurs and Judge Abdus-Salaam in a separate concurring opinion
in which Judge Graffeo concurs.  Judge Read dissents in an
opinion.  Judge Rivera dissents in a separate opinion in which
Chief Judge Lippman concurs.

<u>For Case No. 210</u>:  Order reversed, defendant's motion to suppress
granted and accusatory instrument dismissed, in a memorandum.
Judges Graffeo, Smith, Pigott and Abdus-Salaam concur, Judge
Smith in a separate concurring opinion in which Judge Pigott
concurs and Judge Abdus-Salaam in a separate concurring opinion
in which Judge Graffeo concurs.  Judge Read concurs in result in
an opinion.  Judge Rivera concurs in result in a separate opinion
in which Chief Judge Lippman concurs.


Decided November 25, 2014